IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00141-MEH

LAURIE A. BURNETTE,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff Laurie A. Burnette appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB") filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(c)(3). Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in its determination of this appeal. After consideration of the Plaintiff's Opening and Reply briefs, Defendant's Response, and the administrative record, the Court **affirms** the Administrative Law Judge's decision and the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her application for SSI [AR 197-203] and DIB benefits [AR 180-87], both filed May 20, 2011.  On her DIB application, she claimed an initial onset date of September 8, 2002 [AR 180], which she later amended to September 13, 2003.  [AR 114, 188, 197][1]  Her initial SSI application indicated a September 13, 2003 onset. [AR 197]   Plaintiff alleged she could not work because of back surgery on September 23, 2010, an underactive thyroid, and because she "crushed" her dominant hand.  [AR 114]  The agency denied Plaintiff's DIB application on August 2, 2011 [AR 114-19], and her SSI application on September 2, 2011 [AR 120-31]; notice of the decisions was sent to Plaintiff on September 6, 2011.  [AR 132]

Plaintiff requested a hearing, which was then held on January 30, 2013, via video conference with an administrative law judge ("ALJ") located in Santa Rosa, California.  [AR 149, 167]  The ALJ issued a written ruling on March 19, 2013, finding that Plaintiff was not disabled as of September 13, 2003, through the date of decision, because considering Plaintiff's age, education, work experience and residual functional capacity ("RFC"), there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  [AR 15-27]  Upon Plaintiff's March 19, 2013 request for administrative review of the ALJ's decision [AR 1, 12-13], the SSA Appeals Council on August 9, 2014, allowed Plaintiff 25 days to submit new additional evidence or a statement about the facts and law in the case.  [AR 5-6]  The SSA

---

[1] Plaintiff had considered amending her onset date to August 2010, but at the administrative hearing opted not to do so.  [AR 39-40]

Appeals Council's letter warned that if Plaintiff did not send more information within 25 days, "we will assume that you do not want to send us more information.  We will then proceed with our action based on the record we have."  [AR 6]  On November 14, 2014, having received no additional information from Plaintiff, the SSA Appeals Council denied Plaintiff's request for review, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-3]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her Complaint with this Court seeking review of the Commissioner's final decision.  *See* Complaint, docket #1.

## II.    Plaintiff's Alleged Conditions and Medical Evidence

Plaintiff was born on April 25, 1969, thus was 34 years old in September 2003 when she alleged her disability began.[2]  [AR 188, 197]  She has past work experience as a cashier, a "night cleaner," a construction worker, an "unloader of trucks," and a cook.  [AR 241]  Plaintiff alleged she could no longer work because of back surgery on September 23, 2010, an underactive thyroid, and because she "crushed" her dominant hand.  [AR 114]

Plaintiff received care at the Memorial Health System Emergency Room ("ER") in Colorado Springs and at a variety of medical clinics from April 2005, when the medical record

---

[2] Plaintiff's Opening Brief asserts, "[f]or all intents and purposes, the relevant claim in this matter is the SSI application protectively filed on 05/19/11" and argues Plaintiff was confused about the earlier 2003 date claimed on all forms.  Opening Brief, docket #22 at 4.  Plaintiff indicated a September 2003 onset date on both her applications, which the ALJ discussed with her at the hearing, deciding the 2003 date would be the onset date.  [AR 42]  The record shows that Plaintiff, despite being represented by counsel from the hearing through the appeal and aware of this date discrepancy, failed to send any explanation to the SSA Appeals Council; thus, the Court takes the 2003 date as the alleged onset date.

begins, until it ends in December 2012.  The medical records show the following treatment dates

for the following needs[3]:

- April 24, 2005 – diagnosed with urinary tract infection [AR 405-14]
- February 16, 2006 – arm contusion from fall from ladder [AR 401-04]
- September 4, 2006 – eye irritation perhaps from having been near someone "grinding some fiberglass;" doctor removed a "metallic fragment" from the eye and discharged her [AR 398-400]
- June 10, 2007 – "paint primer in eye;" doctor irrigated it and discharged her [AR 395-97]

In December 2007, Plaintiff had a series of appointments, including at Peak Vista

Community Health Centers ("Peak Vista") and Memorial Hospital to address migraines, a

lipoma under her skin, and back pain she told doctors began when she was involved in a car

accident in 2002.  [AR 296-99; 300-04; 391-94]  Doctors noted "mild degenerative changes at

the C4-5 and C6-7 disc spaces" [AR 303], confirmed by x-rays [AR 391-94].  Doctors referred

her to dermatology for the lipoma and neurology for the back issue.  [AR 298]  Nicholas

Christoff, M.D., of Peak Vista provided detailed notes from his visit with Plaintiff on December

20, 2007, including:

> This 38-year-old woman has a lot of aches and pains and attributes a lot of her troubles to a motor vehicle accident 5 years ago in which it sounds like maybe she had a whiplash.  She was a bit dazed but not unconscious.  Unfortunately, she is vague about her history and keeps interjecting x-ray findings and diagnoses so it is almost impossible to find out what symptoms she has had.  Somehow or other, she has developed back pain.

[AR 294]  Dr. Christoff diagnosed Plaintiff as follows:

> She is probably suffering from posttraumatic stress and whiplash.  She is borderline fibromyalgia.  She has super-imposed headaches, migraine and others,

---

[3] All records are from Memorial Hospital's ER unless otherwise noted.  All treatment was isolated to the date indicated unless otherwise indicated.

as many fibromyalgia patients do.  She doesn't have quiet enough tender points to be sure of that diagnosis.  She needs no further tests.  She is to continue her nondrug pain and relaxation treatments, but she should certainly start medication soon. []  Another problem that might be dealt with later on is the ADHD [].

[AR 295 (drug names and extraneous information omitted).]

The medical record continues with visits to the doctor for acute issues:

• April 16, 2008 – left foot injury; toe pain; splinted [AR 381-85]
• July 30, 2008 – left eye pain; given eye drops [AR 378-80]
• October 10, 2008 – one instance of blood in stool; given stool test to do at home [AR 398-400]
• October 21, 2008 – urinary tract infection; given medication [AR 369-71]
• December 8, 2008 – "bite from human" to her hand after she "got in a fight with someone outside of a bar and the person bit her hand;"  given tetanus shot [AR 365-68]
• April 25, 2009 – wrist injury that occurred when she "jammed it two days ago," also reporting that she had an injury to her wrist two years ago and it "occasionally gives her problems;" splinted and given pain medication. She also noted she "caught [her] right fifth finger in the dryer a couple of days ago" that has also caused her some pain.  [AR 360-64]
• August 4, 2009 – leg pain of unknown origin; given stretching exercises [AR 355-59]
• April 4, 2010 – eye pain with complaints of something such as "glass" being in her eye; preliminary glance at eye showed "redness," but patient left before doctor returned to her for full exam [AR 352-54]
• August 29, 2010 – right hand pain from catching her right hand in the "wringer of an old washing machine;" splinted [AR 348-51]; September 6, 2010 she returned for re-check of hand. "The patient is here to get a new ortho referral that will take [her insurance].  [AR 345-47] On review of the patient's previous visit, she [] was referred back to her family doctor or Peak Vista.  She was not referred to an orthopod.  She had a crush injury to her right hand, had apparently gotten it caught in a wringer, but x-ray was negative.  No signs of fracture or dislocation.  Joint spaces well maintained, so there is really no need for an ortho follow-up."  [AR 346]
• September 23, 2010 – left back neoplasm/lipoma that patient has had "for 10 years" and "apparently beginning to be symptomatic," so the doctor removed it.  [AR 337-44]  Two days later, she returned with post-surgical concerns because the lipoma was draining clear fluid and she felt chest pains.  [AR 328]  She recognized she may have "overdone it" by walking

two miles each of the last two days to try to avoid blood clots post surgery. *Id.* Given EKG, which was normal. [AR 329; 336]

- October 5, 2010 – infection from drain placed for lipoma; drain removed [AR 320-26]
- November 18, 2010 – antibiotics-associated diarrhea; no treatment noted [AR 318-19]
- November 30, 2010 – post-operative back pain despite having "got all better" post surgery; new back pain emerged in different area than surgical site, with no trauma, no swelling or redness, but her pain being "intolerable;" prescribed pain patch [AR 311-17]
- December 16, 2010 – ongoing diarrhea since surgery, stopping for one-to-two weeks and then beginning again; went to Gastroenterology Associates of Colorado Springs ("GACS"); given medication [AR 449-53]
- February, April, and May 2011 – visited Set Family Medical Clinic; received refills for medication; noted sore throat and possible sinus infection [AR 418-19]

Plaintiff then had a series of appointments regarding he hand injury, the first such visit on March 14, 2012, to Peak Vista, where she presented with musculoskeletal pain in right hand from "jamming" the hand two years ago at home; the doctor referred her to a physical therapist and an orthopaedic surgeon for evaluation and treatment. [AR 487-89] She had x-rays done of the hand a few days later, with a finding of "no osseous or soft tissue abnormality" and "no evidence of acute fracture or dislocation." [AR 491] On June 29, 2012, she went to Peak Vista with complaints of back pain and was given exercises to do; however, the doctor also remarked on her hand injury: "Hand is now functionable and stable. Continue the hand exercises." [AR 480] The physical exam also showed: "Right hand – no joint deformity, heat, swelling, erythema or effusion. Full range of motion." [AR 481] The doctor noted subjective complaints of the patient versus the doctor's objective findings:

SUBJECTIVE: This patient is a white female of about 43 or 44 years of age. She states that she caught her right hand in the ringer of a washing machine in 2010. She went to the emergency room and no broken bones were found upon x-ray.

> They advised exercises.   She states that she still has pain along the extensor
> tendon of the middle finger of the right hand at the level of the
> metacarpophalangeal join and she has been recently placed on physical therapy.
> She has had 1 treatment and has been shown some exercises.
> OBJECTIVE: Her physical  exam shows that she really does have a full range of
> motion.  She states it hurts some if she fully flexes[,] but she can bring the fingers
> down to the palm of her hand and completely extend.
> PLAN: I do not see any indication for any further treatment except to continue her
> physical therapy with a home exercise program and recheck here as necessary.

[AR 483]  Plaintiff then attended sessions at South Valley Physical Therapy; at her first session,

the physical therapist noted "this is an old injury" and that they would meet one-to-two times per

week for four weeks and work on exercises.  [AR 484-85]  No records were provided, however,

for any session but the first.  Plaintiff in 2012 continued with visits to Peak Vista for acute issues

– back pain, July 2, 2012, with x-rays showing no issues [AR 490]; leg pain of unknown origin,

September 7, 2012, handled with pain medication [AR 477]; lower back pain, September 25,

2012, resulting in referral to physical therapy [AR 475 (the administrative record provides no

documentation showing therapy ever resulted from this referral)]; and abdominal pain,

December 14, 2012, with no origin or treatment noted [AR 470-71].

For issues with balance, Plaintiff also had a vision evaluation in connection with her

disability claim, visiting the Gleneagle Vision Center and Michael Saxerud, O.D., on October 3,

2012.  [AR 454]  Dr. Saxerud noted: "My findings today indicate difficulties with the efficiency

of [Plaintiff's] visual system.  However, it appears that these difficulties are most likely arising

from a vestibular dysfunction."  [AR 455]  To deal with the these balance issues, Dr. Saxerud

referred Plaintiff to South Valley Physical Therapy for a vestibular evaluation and therapy if

needed.  [AR 454-57]  At physical therapy, Plaintiff received an exercise program to work on her

balance, visiting the therapist a total of four times: November 6, 2012 [AR 460-69]; November 20, 2012 [AR 459-66]; December 6, 2012 [AR 472-74]; and December 18, 2012 [AR 458] with the therapist noting, "balance improved" but "binocular control not improved." [AR 402]

## III.    Medical Opinion Evidence

Plaintiff applied for services from the Colorado Department of Education, Division of Vocational Rehabilitation, at the suggestion of an attorney who began working with her on November 1, 2011.  [AR 77-78, 138]  Vocational Rehabilitation Services referred Plaintiff to Dennis Helffenstein, Ph.D., for a neuropsychological evaluation, which was conducted over two days, the first in February 2012 and the second in March 2012, and chronicled in a medical opinion report dated June 27, 2012.  [AR 435-48]  Plaintiff also underwent an evaluation by a consultative examiner, Ryan Otten, M.D., as part of her disability application; Dr. Otten provided a report dated August 18, 2011, based on his findings.  [AR 422-27]

### A.    Dr. Helffenstein's Report

Based on Plaintiff's self-reporting, Dr. Helffenstein noted Plaintiff had experienced a series of concussions from: (1) a bicycle accident when she was six years old; (2) domestic abuse in 1997; and (3) a car accident in 2002.  [AR 435]  He also commented that Plaintiff reported "chronic exposure to carbon monoxide for a six-month period of time spanning 1997 and 1998" that occurred from "a leak in the muffler of her car." [AR 436]  The report indicates Plaintiff dropped out of school after the eleventh grade and never received a GED.  [AR 437] Plaintiff's work history is listed to include working as an: (1) assistant carpenter, but fired "due to tardiness;"  (2) iron worker; (3) administrative assistant, but fired; (4) night clerk at a

convenience store, but fired after two months because of "poor productivity, numerous errors, and arguments with her boss;" (5) commercial cleaning worker, but fired for being "quite slow in her work," making "multiple errors in her work," and having "frequent arguments with her boss;" and (6) cashier at a fast-food restaurant, but only worked one day because she "found the job extremely stressful." [AR 437]

Dr. Helffenstein conducted neuropsychological tests on Plaintiff. [AR 440-445] The doctor noted that the difference between Plaintiff's Verbal Comprehension Index score and Perceptual Reasoning Index score "approaches statistical significance" and "can be associated with acquired cerebral dysfunction in the left hemisphere" and "suggests that verbal intellectual skills are somewhat worse than nonverbal skills." [AR 441] The doctor also remarked that Plaintiff "performed quite well on many of the neuropsychological tests" and was "functioning remarkably well from a cognitive standpoint" given her reports of concussions and "chronic carbon monoxide poisoning." [AR 445] Dr. Helffenstein said his testing "did demonstrate neuropsychological deficits, inconsistencies, or relative weaknesses most notably in the areas of verbal learning and retention, visual recall, speed of auditory information processing, fine motor speed bilaterally, executive motor skills, and with some relative weaknesses in math and spelling." [AR 445-56]

The doctor then explained his opinion that her neurological problems are not her only limitation based on her self-reporting: "Additional vocational limitations at this time include her significant chronic neck, back, shoulder, and right hand pain." [AR 446] He also noted other conditions she reported to him: "chronic and constant headache pain," a "persisting and

significant problem with fatigue," "stimulus overload" in noisy and busy environments,"

"chronic problems with diarrhea," and "a wide variety of vision problems." *Id*.   Overall, Dr.

Helffenstein assigned Plaintiff a GAF[4] score of 55 and concluded:

---

[4] In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation

> Based on the information I currently have available to me, it is my opinion both as a neuropsychologist and vocational expert that she is most likely totally and permanently vocationally disabled from competitive employment. My overall impression is that it would be extremely unlikely that she would be able to sustain substantial gainful work activity. She may have the potential to supplement her SSDI benefits through some part-time, perhaps, sheltered employment.

[AR 446-47]  He went on to indicate that she would not likely be successful in going back to school in a college-like setting to learn a vocation but "would likely learn best in more of a hands-on or on the job training type situation."  [AR 447]

B.    Dr. Otten's Report

Dr. Otten evaluated Plaintiff through Disability Exam Services as part of Plaintiff's application for benefits.  [AR 422]  He considered her reports of "pain and dysfunction in her right hand, pelvic and low back pain, and chronic clostridium difficile diarrhea" as well as a history of traumatic brain injury, memory problems, and vertigo.  *Id.*  His examination showed "moderate discernible discomfort" with range of motion on the right hand, particularly with the third and fifth fingers; he also noted "significant swelling" of her middle finger of her right hand, which was tender.  [AR 426]  He found moderate tenderness of the cervical spine.  *Id.*   Based on his exam, Dr. Otten provided the following functional assessment:

> Based on the objective findings, there are no recommended limitations on the number of hours the claimant should be able to stand or sit during a normal 8-hour workday.  Due to possible right lower extremity radiculopathy, the number

---

of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

of hours the claimant should be able to walk during a normal 8-hour workday is in the range of 3-4 hours.  It is expected the claimant will only occasionally be able to perform the activities of bending, squatting, crouching, stooping, or kneeling.  Occasionally is defined as less than 4 hours total during a normal 8-hour workday.  There are no assistive devices recommended at this time.  The amount of weight the claimant should be able to lift or carry frequently is less than 15 pounds or occasionally up to 30 pounds.  It is expected the claimant will only occasionally be able to perform the activities of pushing and pulling with both upper extremities.  It is likely the claimant will only rarely be able to perform the activities of grasping, gripping, fingering, handling, and feeling with the right hand.  Rarely is defined as less than 2 hours total during a normal 8-hour workday.  The claimant should have only occasional exposure to stairs and ladders.  There are no other relevant visual, communicative, [or] workplace environmental limitations recommended at this time.

[AR 427]

## IV.     Hearing Testimony

The ALJ held a hearing on January 30, 2013.  [AR 32]  Plaintiff was represented by counsel.  [AR 34]  Plaintiff discussed her employment history, noting a series of day labor, seasonal, and short-term jobs and several firings for, among other reasons, "arguing with the manager."  [AR 42-25]  When asked if she thinks she could work, Plaintiff said, "I imagine I could work sometimes, maybe not on a set schedule, but I could work," explaining that she has migraines and diarrhea that causes her problems with a fixed schedule.  [AR 49]

The ALJ asked Plaintiff to explain what has prevented her from working since 2003, when Plaintiff asserts she became disabled.  [AR 51]  Plaintiff said she had a "traumatic brain injury" "diagnosed by Dr. Helffenstein" that causes her not to remember the years from 2003-2005.  [AR 51]  She noted to the ALJ the traumatizing events previously recited to Dr. Helffenstein that the she asserts caused brain injury – specifically, domestic violence in 1997 and a car accident in 2001 – but said she has no records to show those events occurred.  [AR 52-53]

12

The ALJ pointed out that Plaintiff continued to work after those events, posting some of her highest earnings in the years following the alleged car accident.   [AR 54]   However, Plaintiff claimed her identity was stolen at that time and she did not work at places her wage report said she had worked; she had learned her identity was stolen but never went to fix it, saying "I never made it [to the Social Security office] because I was sick" and later "forgot."  [AR 55]

Plaintiff then answered questions about her memory problems, noting she sees someone named "Chris" once a week for counseling.  [AR 57]  The attorney clarified that the counselor's name is Christy Sorden but that the counselor had not returned calls to provide an address, thus the medical records were not requested.  [AR 58]  Next, the ALJ discussed Plaintiff's hand condition. [AR 62-70]   Plaintiff testified that she can use her right hand for grooming and feeding herself but that she has learned to use her non-dominant left hand more since her crush injury in the washing machine.  [AR 63]  She also said her hand has gotten "a lot better since I went to physical therapy." [AR 64]  Carrying things is still "very hard" because of the weight. [AR 65]  She noted, though, that her hand "hurts all the time" and hurts more the more she uses it.  [AR 67]  However, she is able to lift a cup of coffee with the right hand; with her left hand, she can lift a gallon of milk and pour it into a glass.  [AR 69]  She also said she can carry the laundry in a basket with her left hand, which she estimated weighing about the same as two gallons of milk.  [AR 70]  She noted that she was supposed to go to physical therapy at Peak View for her hand, but because multiple checks bounced, she was considered a no-show which banned her from scheduling the rest of her appointments at this low-income clinic. [AR 70-72] The ALJ had Plaintiff lay both hands on the table to compare them, noting the right looked

swollen.  [AR 83]  Plaintiff testified that swelling increases with additional use and sometimes she has spasms in the hand for more than a minute, which was improved by physical therapy. [AR 84]  She saw a doctor in April of 2012 regarding her hand to consider surgery, but "just told him [her] hand was okay because he was shaking his head and his hands" because he "was very old."  [AR 86]  "I didn't want him to do surgery on my hand."  [AR 87]  Regarding her back issues, Plaintiff testified the doctor cut her muscle when she had the lipoma removed; she had gone to physical therapy twice a week for that starting a month before the ALJ hearing.  [AR 68]

Plaintiff testified that she spends her free time reading on the computer for about one-to-two hours a day.  [AR 72]  She also enjoys collecting buttons and sewing.  [AR 91]  She pulls weeds in the garden during the summer.  [AR 73]  She visits her girlfriend's parents about once a week.  [AR 74]  She stopped driving in 2006 because of double vision, noting she has gone to vision therapy for one-to-two months.  [AR 75]  Plaintiff said she "has a hard time leaving the house anymore" because she fears she will have to use the bathroom.

Upon questioning from her attorney, Plaintiff explained that she had an infection in 2010 after her lipoma removal that led to her having diarrhea.  [AR 78]  She was treated for the diarrhea at Gastroenterology Associates of Colorado and has not returned there since 2010, but testified she still has diarrhea "at least twice a week" lasting "anywhere from two hours a day to all day," causing her to spend up to six hours total a day in the bathroom, sometimes as long as two hours at a time.  *Id*.  She said she takes probiotics but will not take over-the-counter anti-diarrhea medication because of what she has learned about such drugs on the Internet, and she has not returned to the doctor for the problem.  [AR 80]  She testified that she gets "stiff" from

sitting "too long," which she quantified as the length of the hearing so far, at that time 41

minutes.  [AR 88]  She said she could stand for "at least an hour at a time," and that standing

was more comfortable than sitting.  [AR 89]

A VE then testified – although not the VE whose curriculum vitae was provided to

Plaintiff before the hearing, to which Plaintiff did not object – first explaining Plaintiff's former

jobs to the ALJ.  [AR 93-100]  The ALJ then gave the VE the following hypothetical:

> [L]et's assume we have an individual with the claimant's age, education, and
> background.  Let's assume for my first hypothetical, this individual is restricted to
> a maximum exertional level of light work; let's assume that she can at a
> maximum lift and carry 20 pounds; and that this individual can occasionally
> perform posturals, but should be precluded from climbing any ladders, ropes, or
> scaffolds; precluded from working at heights or with hazardous machinery and
> she is on medications[;] and as a precautionary measure[,] let's assume further
> that this individual can [] frequently perform manipulative such as reach, handle,
> finger, feel.

[AR 100-01 (extraneous words omitted)]  The VE testified that such an individual could not

perform any of Plaintiff's past work.  [AR 101]  However, the VE noted such a person could

perform the jobs of merchandise marker or routing clerk.  [AR 101-02]

The ALJ then modified the hypothetical to reduce the manipulative category to

"occasional reach, handle, finger, feel."  [AR 102]  The VE said such a person could person jobs

such as counter clerk photo finishing or sandwich board carrier.  *Id.*  The ALJ asked the VE to

add another element, "avoid[ing] fast, repetitive, manipulatives [such as] working on a conveyor

belt [] or typing where you do the same motion over and over and over again[,] or keyboarding."

[AR 103 (extraneous words omitted)] The VE replied those conditions would not preclude the

four job titles named.  *Id.*  The ALJ then asked the VE to eliminate reaching overhead, which the

15

VE said would eliminate the merchandise marker and that of routing clerk but would not eliminate jobs such as Sandwich board carrier or counter clerk, which the VE noted were merely examples of the types of jobs such a person could do but were not exclusive.  [AR 103-04]

The ALJ  then asked for jobs where there would be "less than occasional use of reaching, handling, fingering, feeling."  [AR 104]  The VE said such a person could handle jobs such as being a school bus monitor or a surveillance system monitor.  [AR 104-05]  Finally, the ALJ added one more restriction: "[T]his hypothetical individual should have an opportunity to alternate positions between sitting and standing perhaps every hour just to be able to shift a little bit" and then resume their position, "again with an ability to sit for unlimited periods[,] stand and walk a total of up to six hours[,] and lift and carry a maximum of 20 pounds."  [AR 105-06]  The VE testified that such a person would still be able to be a counter clerk or a systems surveillance monitor.  [AR 106]

Plaintiff's attorney also questioned the VE.  [AR 107-09]  She used the ALJ's first hypothetical but added the restriction that the person "would be needing to be in the restroom for at least two hours a day[,] at least two days a week[,] on an unpredictable basis."  [AR 107]  The VE replied: "Counselor, no, that takes the worker off of say four hours of being on task per week[,] and that's just not acceptable to employers in full-time competitive employment."  *Id*. The attorney also told the ALJ that given Plaintiff's history of "jobs ending due to arguments with management[,] combined with Dr. Helffenstein's findings in his report" that if the ALJ did not find disability based on the record, the ALJ should order a psychological consultative

examination ("CE").  [AR 109]  The ALJ said she would inform Plaintiff if she were to find such a CE to be necessary.  [AR 110]

## LEGAL STANDARDS

### I.   SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed

residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.     Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.  If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *See Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991) (citing *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987)).  However, reversal may be appropriate when

the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ'S RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the date her filed his application (Step One).  [AR 20]  The ALJ further determined that Plaintiff had the following severe impairments: "history of August 2010 crush type injury to the right dominant hand; history of lipoma on the back, status post September 2010 surgical removal; degenerative changes in the cervical and lumbar spine; and obesity."  (Step Two).  *Id.*  However, the ALJ found that Plaintiff did not have medically determinable impairments from the September 13, 2003 alleged onset of disability until December 2007, when the medical record effectively begins.[5]  Therefore, the ALJ found Plaintiff was not disabled from the alleged onset of disability until December 2007; the remainder of the ALJ's evaluation was based on the period beginning December 2007.  [AR 21]  The ALJ then noted the hand injury, history of lipoma on the back, spine changes, and obesity "have more than a minimal effect on the capacity for basic work activity" and thus are "severe" medically determined impairments under the Social Security regulations.  [AR 21]

However, the ALJ found the Plaintiff's visual issues, gastrointestinal problems, hypothyroidism, and reported history of multiple concussions to be "non-severe" as follows:

The record includes a neuropsychological evaluation report of early 2012 by Dennis A. Helffenstein, Ph.D., who diagnosed cognitive and mood disorders with

---

[5] The ALJ noted that "[a]lthough there is evidence of a February 2006 x-ray report of the left forearm, the results were unremarkable and there is no evidence that the problem lasted for twelve continuous months or that it prevented basic work activity."  [AR 20]

an opinion that the claimant was unable to perform competitive employment or sustain gainful work activity.  Dr. Helffenstein's opinion, however, is based on multiple head concussions that have not been substantiated by the medical evidence.    Dr. Helffenstein noted blurred vision and disequilibrium as contributing to the loss of ability to work but, according to an October 2012 report by Michael [Saxerud], O.D., the claimant suffered from only a slight refractive error of the left eye.  Dr. [Saxerud] further diagnosed a vestibular dysfunction for which therapy was recommended.  Notably, the December 18, 2012 therapy report noted improvement of the balance problem.  Returning to Dr. Helffenstein's report, there were also signs of diminished concentration and attention and complaints of depression and anxiety.  Dr. Helffenstein nonetheless reported that the claimant's intellectual functioning was at the above average range.  The claimant did not express difficulty completing the testing due to fatigue or cognitive symptoms and was not unduly distracted.  Dr. Helffenstein further reported that the test scores were valid and that the claimant was "functioning remarkably well from a cognitive standpoint."  [GAF] was also 55 that indicates moderate symptoms but inconsistent with an inability to perform. There has been no treatment related to the claimant's complaints of depression as noted in progress notes of her primary care physician.  Thus, the undersigned is not persuaded that there is any mood disorder or neuropsychological disorder resulting in more than a minimal effect on the capacity for basic work activity.

[AR 21]

In making this finding, the ALJ said she considered the four broad functional areas set out in the disability regulations for evaluating mental disorders, known as the "paragraph B" criteria.  *Id.*  She found in activities of daily living, Plaintiff has no limitations; in social functioning, she has "mild limitation" in that she has been terminated from jobs because of arguments with her manager, however there are "no other signs of difficulty interacting with others."  *Id.*  The ALJ found Plaintiff had "mild limitation" in concentration, persistence, or pace, but "has experienced no episodes of decompensation" of extended duration.  *Id.*  Thus, the ALJ concluded Plaintiff's medically determinable mental impairment was "non-severe."  [AR 21-22]

Regarding Plaintiff's diarrhea, the ALJ found that while she was at one time diagnosed with Clostridium difficile colitis, "there is no evidence of any aggressive medical care to indicate that she is significantly symptomatic."  [AR 22]  Regarding this issue as well as other claimed issues, the ALJ noted:

> Her treating physician further prescribed only over-the-counter medication.  Thus, the medical evidence does not persuasively support a loss of ability for basic work activity due to the colitis for the requisite minimum duration.  The claimant also has a history of hypothyroidism.  Levothyroxine has been prescribed and the disorder is monitored without significantly abnormal signs and symptoms preclusive of basic work activity.  There is no evidence of a visual deficit in the left eye attributable to a refractive error that is easily remedied.  Physical therapy was also provided for complaints of disequilibrium with good results.  The undersigned finds that the colitis, hypothyroidism, visual deficit and disequilibrium have not been shown to seriously compromise the claimant's capacity for basic work activity.  Therefore, these medical disorders are "non-severe."

*Id*.  Thus, the ALJ concluded that none of Plaintiff's impairments or combination of impairments were equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment (Step Three).  *Id*.

The ALJ then determined that Plaintiff had the RFC to perform light work except she is: (1) limited to occasional postural activities with no climbing of ropes, ladders, and scaffolds; (2) precluded from work at heights or around moving machinery as a safety precaution; (3) able to use the  upper extremities for occasional reaching, handling, fingering, and feeling but precluded from overhead reaching; and (4) precluded from repetitive dexterity, such as in typing or working at a conveyor belt and repeatedly performing the manual task.  [AR 23]  The ALJ based her finding on medical evidence, opinions of Drs. Helffenstein and Otten, and evaluation of Plaintiff's subjective complaints.  *Id*.  The ALJ gave Dr. Otten's opinion "some weight."  [AR

24]   The ALJ found discrepancies with the doctors' conclusions as to Plaintiff's upper extremities limitations noting: (1) Plaintiff has not pursued aggressive medical treatment for her back or hand; (2) the medical record shows objective findings such as no fractures or dislocations; (3) Plaintiff's treating physician at the time said "she really does have full range of motion; and (4) Plaintiff testified to a variety of ways of using her hands such as collecting buttons and sewing.  [AR 24]  The ALJ did, however, give Plaintiff "the benefit of the doubt" based on "ongoing tenderness and limited motion in the last three digits of the right hand," finding a preclusion to jobs requiring repetitive manual dexterity.  *Id.*

After ruling that Plaintiff could not perform any past relevant work (Step Four), the ALJ went on to determine that considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform work existing in significant numbers in the national economy (Step Five).  [AR 25-26]  As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA.  [AR 27]

Plaintiff sought review of the ALJ's decision by the Appeals Council; however, the Council determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1]

## ANALYSIS

On appeal, Plaintiff asserts the ALJ: (1) erred in failing to include a cognitive disorder, a vestibular disorder, and recurrent, episodic diarrhea as severe impairments; (2) erred in determining that the Plaintiff retains the RFC for light work; (3) failed in her duty to fully develop the administrative record; (4) improperly f[a]iled to weigh the opinion of Dr.

Helffenstein; and (5) improperly relied on the opinion of the VE whose vocational qualifications were never established.

## I.      Consideration of all Medically Determinable Impairments

The ALJ determined that Plaintiff had the following severe impairments: "history of August 2010 crush type injury to the right dominant hand; history of lipoma on the back, status post September 2010 surgical removal; degenerative changes in the cervical and lumbar spine; and obesity" since December 2007.   [AR 20-21]   Yet the ALJ found Plaintiff did not have medically determinable issues with regard to visual issues, gastrointestinal problems, hypothyroidism, or reported history of multiple concussions.   [AR 22]   Plaintiff argues the ALJ erred in finding those conditions to be non-severe impairments.    Opening Brief, docket #22 at 19-24.   Defendant counters that no error occurred because the non-severe finding came at Step Two, explaining:

> Step Two is merely a threshold determination used to quickly screen and dispose of groundless claims where a claimant has *no* impairment that significantly affects the ability to do basic work activities.  If a claim survives Step Two, as Plaintiff's claim did here, the ALJ must then consider all of the impairments, severe and non-severe, in subsequent steps of the sequential process.  So long as the ALJ considers the record as a whole at subsequent steps, no reversible error has occurred.

Response, docket #24 at 7 (emphasis in original) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion [] at step two and proceeded to the next step of the evaluation sequence.")).]

First, the Court questions Defendant's conclusion that it matters not whether the ALJ omitted an impairment at Step Two because the "ultimate question" is whether an impairment

causes work-related limitations beyond those considered for the RFC assessment.  Defendant

cites *Carpenter*, 537 F.3d at 1264 in support of this conclusion; however, the question in

*Carpenter* did not involve a disregarded impairment but, rather, whether the ALJ properly

assessed the identified impairments in combination, as well as singly, to determine whether they

were "severe."  *Id.* at 1266.  Certainly, an error in failing to consider all impairments *in*

*combination* would be harmless if the ALJ found at Step Two that a claimant's benefits could

not be denied based upon a consideration of all impairments *singly*.  *See id.*  Step Two of the

evaluation process requires an ALJ to decide whether the claimant has a severe medically

determinable impairment. 20 C.F.R. § 416.920(a)(4)(ii).  The regulations require the ALJ to

"consider all evidence in [the] case record when [he] makes a determination or decision whether

[claimant is] disabled," 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3), and the Tenth Circuit

requires the ALJ to discuss "the significantly probative evidence he rejects[,]"*Clifton v. Chater,*

79 F.3d 1007, 1010 (10th Cir.1996).

　　　Here, it is undisputed that the ALJ in the Step Two assessment found Plaintiff did not

have medically determinable issues with regard to visual issues, gastrointestinal problems,

hypothyroidism, or reported history of multiple concussions for lack of documentary evidence of

a diagnosis.  An ALJ's rejection of an impairment altogether could be reversible error.  "It is

beyond dispute that an ALJ is required to consider all of the claimant's medically determinable

impairments, singly and in combination; the statute and regulations require nothing less. . . .

Further, the failure to consider all of the impairments is reversible error."  *Salazar v. Barnhart*,

468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061,

1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Accordingly, the question is whether the disregarded impairments were "medically determinable." *See Railey v. Apfel*, 134 F.3d 383, 1998 WL 30236, at *3 (10th Cir. 1998) (finding that the ALJ's failure to mention plaintiff's back impairment, wrist impairment or respiratory impairment at step two constituted legal error); *see also Elliott v. Astrue*, 507 F. Supp. 2d 1188, 1194 (D. Kan. 2007) ("Therefore, the first consideration at step two is what, if any, medically determinable impairments plaintiff has regardless of the credibility of her allegations of the severity of those impairments."). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 416.908. Section 416.908 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 416.928.

Here, the ALJ noted the alleged cognitive disorder, vestibular disorder, and diarrhea but rejected them based on a variety of reasons the ALJ described, as discussed above.   She reviewed the doctors' opinions, giving them some weight but finding them inconsistent with the medical record; she discussed Plaintiff's lack of pursuit of medical treatment for these issues; and she explained her concerns regarding Plaintiff's own testimony of her capabilities.   The ALJ provided extensive discussion of her findings and reasoning for considering some impairments as severe and others as non-severe.   As described in detail by the Court's summary of the ALJ's opinion above, the ALJ found Dr. Helffenstein's report to be limited in helpfulness because his cognitive conclusions were based largely on Plaintiff's self-reporting and not based on medical data.   Regarding visual issues, the ALJ reviewed the eye evaluations and conclusions, finding Plaintiff's problem was aided by vision therapy and that the medical record failed to show significant ongoing problems with a vestibular disorder.   Further, regarding the issues with diarrhea, the ALJ found Plaintiff failed to take even over-the-counter medication or see a doctor about her problem over the course of many years, and the medical record fails to indicate an ongoing problem beyond Plaintiff's self reports.

The Court notes that despite the ALJ finding these issues non-severe, she in fact included limitations responsive to some of these limitations.   Regarding cognitive issues, the ALJ allowed only unskilled jobs, the "least complex type of jobs." *See* SSR 72-41, 1982 WL 31389, at *2; 20 C.F.R. § 404.1568 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.") Regarding vestibular/balance issues, which the ALJ found physical therapy had improved, the ALJ limited the RFC to

preclude the climbing of ropes, ladders, and scaffolds, and prevented Plaintiff from working at heights or moving machinery.  [AR 23]  While the ALJ did not allow for limitations regarding the diarrhea issues, the Court finds Plaintiff's failure to seek medical attention for the disorder or take over-the-counter medication for the problem is enough for the ALJ to have considered it a non-severe impairment.

Therefore, the Court finds the ALJ did not err but reasonably considered all of Plaintiff's medically determinable impairments; her analysis was sufficient and based on substantial evidence in the record.[6]

## II.    Finding of Plaintiff's Capability for Light Work

Plaintiff here makes a variety of arguments all challenging the ALJ's conclusion that Plaintiff had the RFC for light work.  *See* Opening Brief, docket #22 at 24-29.  Specifically, Plaintiff contends the ALJ erred in the weight she placed on Plaintiff's testimony and in the weight she gave to doctors' opinions, therefore her RFC conclusion must be rejected. *Id*. Defendant counters that the ALJ properly analyzed the medical record, the opinion evidence, and the credibility of Plaintiff, thus the Court should not act as factfinder and reweigh the evidence. *See* Response, docket #24 at 8-12.

---

[6] Plaintiff also in this section of her Opening Brief criticizes the ALJ's handling of the medical record regarding citations to Plaintiff's alleged depression (although Plaintiff does not list depression as one of the issues as a medically determinable condition that ALJ should have considered).  Opening Brief, docket #22 at 19-24.  The Court notes any error in citation here was harmless and does not change the Court's opinion that the ALJ based her decision on the entirety of the medical record and all of Plaintiff's alleged conditions, including depression, which she found not adequately established in the medical record..

As explained above, the ALJ determined that Plaintiff had the RFC to perform light work except she is: (1) limited to occasional postural activities with no climbing of ropes, ladders, and scaffolds; (2) precluded from work at heights or around moving machinery as a safety precaution; (3) able to use the  upper extremities for occasional reaching, handling, fingering, and feeling but precluded from overhead reaching; and (4) precluded from repetitive dexterity such as in typing or working at a conveyor belt and repeatedly performing the manual task.  [AR 23]

An RFC assessment is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities."  SSR 96-8p, 1996 WL 374184 at * 2.  It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'"  *Id.*  "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).  The ALJ may consider "the consistency or compatibility of nonmedical testimony with objective medical evidence."  *Huston v. Bowen*, 838 F.2d 1125, 2231 (10th Cir. 1988). Additionally, even if the ALJ finds an impairment to be severe at Step Two, the ALJ does not err when not including limitations for that impairment in the RFC when that limitation was not "borne out by the evidentiary record." *See Miller v. Astrue*, 496 F. App'x. 853, 859–60 (10th Cir.2012).

The Court finds no error in the ALJ's assessment of Plaintiff's RFC with respect to Plaintiff's right hand injury, pain, or purported mental issues. The ALJ properly considered the medical evidence concerning the condition and discussed in detail the reasoning for her findings based on the medical evidence, the opinions of Drs. Helffenstein and Otten, and the ALJ's own evaluation of Plaintiff's subjective complaints. *Id.* The ALJ explained that she found discrepancies with the doctors' conclusions as to Plaintiff's upper extremities limitations and Plaintiff's own testimony, noting: (1) Plaintiff has not pursued aggressive medical treatment for her hand; (2) the medical record shows objective findings such as no fractures or dislocations; (3) Plaintiff's treating physician at the time said "she really does have full range of motion; and (4) Plaintiff testified to a variety of ways of using her hands such as collecting buttons and sewing. [AR 24] The ALJ did, however, give Plaintiff "the benefit of the doubt" based on "ongoing tenderness and limited motion in the last three digits of the right hand," finding a preclusion to jobs requiring repetitive manual dexterity. *Id.* Regarding mental conditions, the ALJ found no medical support for mental conditions save her self-reported problems to Dr. Helffenstein – reports the ALJ found lacked credibility.

In the opinion, the ALJ clearly explained the lack of supportive documentation for Plaintiff's claims and provided four additional reasons she did not find Plaintiff to be credible, as summarized well by Defendant in its Response, which correctly characterizes the record evidence reviewed by the Court:

> First, regarding Plaintiff's allegations that her alleged headaches, cognitive disorder, vestibular disorder, and diarrhea severely limited her functioning, the ALJ noted that "the type of treatment provided has been minimal, intermittent, and symptomatic and inconsistent with severe symptoms precluding basic work

activity."   Second, in regards to all of her impairments, the ALJ noted that Plaintiff's care had been relatively conservative and not of the level consistent with her allegations.   Third, the ALJ noted that Plaintiff was extremely vague and general in her testimony.   And finally, the ALJ noted that Plaintiff's symptoms were inconsistent with her activities of daily living.   Specifically, Plaintiff reported to the agency that she had no issues with personal care or the ability to manage money, and she was able to care for her pet, watch her niece for an hour a week, make simple meals, vacuum, do dishes, clean the bathroom, sweep the front porch, shop, read a lot, sew, garden, ride her bike, make cakes for birthdays, exercise, collect buttons and marbles, play Scrabble or other games, and work at Goodwill as part of her vocational rehabilitation.

Response, docket #24 at 9-10 (internal cites omitted).

Still, the ALJ limited Plaintiff's RFC to only occasional reaching, handling, fingering, and feeling; she also precluded Plaintiff from overhead reaching, repetitive dexterity, and climbing ropes, ladders and scaffolds.  [AR 24]  The ALJ dealt with Plaintiff's pain in the RFC and limited Plaintiff to light exertion with only occasional postural activity.  *Id*.  The ALJ explained that after a detailed review of the record, the opinions, and the testimony, she did not see certain limitations borne out by the evidentiary record as in *Miller*; those the ALJ did see in the evidence, she reasonably accounted for in the RFC.  Further, the Court finds unavailing Plaintiff's uncited arguments that the medical record is lacking in facts because poverty, lack of health insurance, and ignorance of the medical system and/or memory issues caused Plaintiff not to seek care. Opening Brief, docket #22 at 29.  The Court's extensive review of the medical record shows Plaintiff did seek care many times over the years and had a variety of doctors care for her for many problems, yet the ALJ reasonably could have found the record fails to support a less restrictive RFC.

Thus the Court thus finds the ALJ did not err in finding that Plaintiff had the RFC for light work but based her opinion on substantial evidence.[7]

## III.     ALJ's Development of the Record

Plaintiff next argues that the ALJ failed to develop the record, specifically by not using her subpoena powers to obtain records from Plaintiff's therapist and by not ordering a psychological consultative examination.  Opening Brief, docket #22 at 29-33.

In a social security disability case, the claimant bears the burden to prove her disability. 20 C.F.R. § 303.1512(a); *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009).  An ALJ may purchase a consultative examination to seek to resolve an inconsistency in the evidence, 20 C.F.R. § 404.1519a(b), but the ALJ is not required to do so if the Plaintiff has not met her burden to show a severe impairment.  *Flaherty v. Astrue*, 515 F.3d 1067, 1072 (10th Cir. 2008).

The Court notes that the hearing transcript reveals that Plaintiff's then lawyer asked about the therapy records yet did not ask the ALJ to use her subpoena powers at that time.  [AR 58]   Further, the Appeals Council later gave Plaintiff's attorney three additional months to submit material evidence to be considered, yet she did not do so.  [AR 5-12]   Regarding Plaintiff's argument that the ALJ should have ordered a psychological consultative examination, the ALJ addressed this in her opinion, finding, "Although Plaintiff's counsel requested a consultative psychological evaluation for the allegation of emotional disorders, the claimant did not express serious emotional difficulties at the hearing, nor are they echoed in the contemporaneous treating records to warrant such development." [AR 25]  As discussed above,

---

[7] To the extent Plaintiff's argument here relies on issues of weight of medical opinion evidence, the Court addresses the issue below as Plaintiff raises it as a separate issue.

the ALJ found the medical opinions regarding Plaintiff's alleged cognitive disorders to be based largely on Plaintiff's subjective reports without accompanying medical evidence. [AR 21-22] As the ALJ indicated, Dr. Helffenstein's notes indicate Plaintiff had average to high intelligence, good comprehension, normal affect, and no overt signs of anxiety, depression, irritability, frustration, distraction, or fatigue. [AR 21-22, 439-40]

The Court concludes that the ALJ did not err by not using her subpoena powers to obtain records from Plaintiff's therapist and by not ordering a psychological consultative examination.

## IV.     ALJ's Weighing of Dr. Helffenstein's Medical Opinion

Plaintiff acknowledges there is no traditional "treating physician" in this case. Opening Brief, docket #22 at 33. Plaintiff notes that the medical record was largely developed by Plaintiff's previous lawyer, who sent Plaintiff to Vocational Rehabilitation for evaluation. *Id*. There, Plaintiff twice saw Dr. Helffenstein, who provided a medical opinion – detailed extensively by the Court above – and thus argues the ALJ should have given more weight to this opinion. *Id*. Defendant counters that the ALJ need not have given more weight to the opinion as she reasonably discounted the opinion as its premises were based on Plaintiff's complaints. Response, docket #24 at 11.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)). The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians and

"nonexamining" (or "consulting") physicians.  *See* 20 C.F.R. § 416.927(c).  If the medical

opinion of a treating physician is well supported by medically acceptable evidence and is not

inconsistent with the other substantial evidence in the record, an ALJ must give it controlling

weight.  *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24,

2014) (citing 20 C.F.R. § 416.927(c)(2)).

However, if the opinion of a treating physician does not merit controlling weight or if

there is no opinion by a treating physician, the ALJ must consider the following factors in

determining how to evaluate other medical opinions in the record: length of the treating

relationship, frequency of examination, nature and extent of the treating relationship, evidentiary

support, consistency with the record, medical specialization, and other relevant considerations.

*Id.*  "An ALJ may dismiss or discount an opinion from a medical source only if his [or her]

decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations'

and if he [or she] provides 'specific, legitimate reasons' for [the] rejection."  *Id.* (quoting *Chapo*,

682 F.3d at 1291).

It is error for an ALJ not to adequately state and explain what weight he or she gives to

medical opinions.  *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ

must give "good reasons" for the weight he or she ultimately assigns each medical opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).  The ALJ's decision must be

sufficiently specific to make clear to any subsequent reviewer the weight given to the medical

opinion, and the reason for that weight.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir.

2007).  Even though an ALJ is not required to discuss every piece of evidence, it must be clear

that the ALJ considered all of the evidence.  *Clifton*, 79 F.3d at 1009-10. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010.  Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion.  *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

Here, Dr. Helffenstein, a consultative physician, relied largely on Plaintiff's subjective complaints and descriptions of undocumented events in her history.  [AR 435-448]  As discussed above regarding the ALJ's opinion, the Court finds that the ALJ reasonably discounted Dr. Helffenstein's opinion as based on Plaintiff's self-reporting, in conflict with both the medical record and Plaintiff's own credibility issues at the hearing.  The ALJ thus gave "good reasons in the notice of determination or decision for the weight [s]he ultimately assign[ed] the opinion." *See Watkins*, 350 F.3d at 1301. The ALJ described in detail Dr. Helffenstein's report, medical evidence counter to that report (such as Plaintiff's vestibular dysfunction having resolved with minimal treatment [see AR 21]), and the discrepancy between Dr. Helffenstein's report and Plaintiff's own testimony and activities of daily living.  The Court notes, finally, that the ultimate issue of disability is reserved to the Commissioner.  *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

In sum, the Court finds the ALJ applied the correct legal standards in weighing Dr. Helffenstein's opinion and adequately described her reasoning for not relying on the opinion, thus the ALJ's opinion will not be disturbed on review.

**V.      ALJ's Reliance on VE whose Qualifications were Never Established**

Finally, Plaintiff argues the ALJ erred "in the use and reliance on a [VE] whose credentials are not in the record."  Opening Brief, docket #22 at 35.  The curriculum vitae provided to Plaintiff and her attorney was for a VE named Michael Stinson.  [AR 171-73]  However, the VE who testified at the hearing was named "Mr. Graham."  [AR 93]  The ALJ questioned the VE and then said to Plaintiff's lawyer: "If there's anything you want to bring out from the VE, go right ahead."  [AR 106-07]  Plaintiff asserts that the attorney was never given the opportunity to question the VE about his credentials.  Opening Brief, docket #22 at 36.  Defendant counters that Plaintiff could have asked the VE about his expertise and objected to his qualifications but did neither.  Response, docket #24 at 14.

Other jurisdictions have found this argument was waived on appeal when not objected to at the hearing.  *See, e.g., Haskins v. Comm'r of Social Sec.*, C/A No. 5:05-cv-291 (DNH/RFT), 2997 WL 5113781, at *16 (N.D.N.Y. Sept. 11, 2008); *Carter v. Comm'r of Social Sec.*, C/A/ No. 2:14-cv-244, 2014 WL 4987419, at *9 (S.D. Ohio Oct. 6, 2014).  Further, Defendant argues that Plaintiff makes no argument as to harm caused by her having a different VE testify.  Response, docket #24 at 14.

The Court agrees that Plaintiff had the opportunity to question the VE regarding his qualifications and waived that right by not doing so or by failing to object in any way to the qualifications at the hearing; further, Plaintiff fails to assert any harm from having a different VE, thus the opinion will not be disturbed on review.

**CONCLUSION**

In sum, the Court concludes that the ALJ in this case did not err in: (1) not including a cognitive disorder, a vestibular disorder, or episodic diarrhea as severe impairments; (2) determining Plaintiff has the RFC for light work; (3) developing the administrative record; (4) weighing the opinion of Dr. Helffenstein; or (5) relying on the opinion of the VE.  Accordingly, the Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied.  Therefore, the decision of the ALJ that Plaintiff Laurie A. Burnette was not disabled is **affirmed**.

Dated at Denver, Colorado this 8th day of October, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge